MANSFIELD, J.
(specially concurring).
While I agree that Anthony Bisignano should not be disqualified from running for state senate, I cannot join the plurality opinion. I agree with the Panel, the district court, and Iowa’s elected representatives that felonies and only felonies are “infamous crimes” under article II, section 5 of the Iowa Constitution.
As the dissent correctly points out, the plurality throws out nearly a hundred years of this court’s precedents. Yet what is its replacement? That is hard to tell. *858 Lacking a sound conceptual floor for its opinion, or a clear test, I think the plurality has unnecessarily introduced uncertainty and invited future litigation over voting rights. For example, I anticipate we will now see right-to-vote lawsuits from current prison inmates.
The plurality’s assertion that its decision is “limited” does not make it so. Let’s review the plurality’s standards, which it admits are “nascent.” The plurality says that only felonies falling within “the regulatory purposes of article II, section 5” disqualify a person from voting. The plurality also says that only “particularly serious” crimes that “tend to undermine the process of democratic governance through elections” disqualify a person from voting. The plurality adds, “The infamous crimes clause incapacitates infamous criminals who would otherwise threaten to subvert the voting process and diminish the voices of those casting legitimate ballots.”[5]
I think most people would agree these unrefined standards basically offer no guidance at all, therefore leaving the door wide open for future litigation. Notably, Iowa’s constitution, and the plurality opinion make no distinction between convicted felons who are presently incarcerated and those who have served their time. Thus, under the plurality’s approach, even a person who is presently serving a lifetime-without-parole-sentence can argue that he or she should be able to vote from prison because barring him or her from voting would “undermine the process of democratic governance through elections.” When we overrule precedent that established a definite rule, we owe the public more than a welcome mat for future lawsuits.
The plurality’s approach to whether a crime is “infamous” is an odd mix of halfhearted originalism and excessive fealty to a court decision from Indiana. Initially, the plurality draws on mid-nineteenth century sources to ascertain the meaning of “infamous.” According to this review, “infamous crime” does not mean “felony” nor is it based on the punishment for the crime. Rather, it is based on how bad the crime is. Thus, “infamous” seems to mean something like “heinous” according to this part of the plurality opinion. Accordingly, the plurality quotes an 1839 Iowa territorial law listing infamous crimes that disqualify a person from voting. The Statute Laws of the Territory of Iowa, Code of Criminal Jurisprudence, Tenth Div., § 109, at 182 (1889). Actually, this list appears to include most felonies.[6] I would argue that this list, if anything, supports either of two viewpoints: (1) “infamous crime” was up to the legislature to define, or (2) “infamous crime” meant felony.
The plurality then shifts gears and moves on to out-of-state precedent, primarily a 2011 decision of the Indiana Supreme Court. See Snyder v. King, 958 *859 N.E.2d 764 (Ind.2011). That decision interpreted article II, section 8 of the Indiana Constitution, which provides, ‘“The General Assembly shall have the power to deprive the right of suffrage, and to render ineligible, any person convicted of an infamous crime.’ ” Id. at 768 & n. 1 (quoting Ind. Const, art. II, § 8). In its opinion, the Indiana court, like the plurality here, began with a review of historical sources. Id. at 773-80.
However, toward the end of its opinion the Indiana Supreme Court largely turned away from historical analysis. Instead, it decided that article II, section 8 of the Indiana Constitution serves only a “regulatory” purpose and that it can apply only to crimes like “treason, perjury, malicious prosecution, and election fraud,” where the person who committed the crime “may be presumed to pose a bona fide risk to the integrity of elections.” Id. at 781-82. In justifying this rather stark change in direction, the court relied on another clause of the Indiana Constitution as well as the placement of article II, section 8 within article II. Id. at 781. As the court explained,
[T]he Infamous Crimes Clause was not intended to be used primarily as a retributive or deterrent mechanism of punishment. It is a cardinal principle of constitutional interpretation that our Constitution should be interpreted as a whole. Article I, § 18, of the Constitution provides that “[t]he penal code shall be founded on the principles of reformation, and not of vindictive justice.” Ind. Const, art. I, § 18. Interpreting the Infamous Crimes Clause as authorizing the General Assembly to use a particular punishment solely for the purpose of exacting vindictive justice would conflict with this provision of the Indiana Bill of Rights. And we will avoid reading such a conflict into the Constitution unless the document itself clearly requires us to do so.
We think instead that the Infamous Crimes Clause is properly understood primarily as a regulatory measure. While history clearly demonstrates its punitive characteristics, its primarily regulatory character is clearly demonstrated by its placement in Article II, which seeks to regulate suffrage and elections, and the justification underlying criminal disenfranchisement provisions generally.
Id. (citation omitted).
My colleagues here largely track Snyder but back off from fully embracing it. Thus, the plurality does not reach Snyder’s ultimate conclusion that violent serious felonies like murder and kidnapping cannot disqualify a person from voting. But the plurality’s quasi-Snyder jurisprudence has multiple problems as applied to Iowa.
First, Iowa’s situation is different from Indiana’s. Among other things, Iowa does not have a constitutional provision requiring that punishment be “founded on the principles of reformation.” Ind. Const, art. I, § 18. Also, as I discuss below, Iowa amended and reenacted its constitutional clause disenfranchising persons convicted of infamous crimes in 2008. Importing an Indiana decision into Iowa is flawed on this ground alone.
In addition, I think some of Snyder’s premises are questionable. For example, I do not place much stock in the “placement” of article II, section 8 within the Indiana Constitution. Nor do I place much stock in the placement of article II, section 5 within the Iowa Constitution. These are the parts of those constitutions that relate to voting. Where else would you include a clause that authorizes denial of the vote to persons convicted of crimes? So I think it is a stretch to say that because these provisions appear in their *860 respective constitutions under “suffrage,” we have to interpret them narrowly.
Third, Snyder at least deals with the question of whether people in prison can vote even if their crime is not infamous. Thus, Snyder concludes that the state can use its “police power” to deny a convicted person the right to vote during the term of imprisonment regardless of the crime committed. Snyder, 958 N.E.2d at 784-85. But Snyder cites no textual basis for this conclusion in the Indiana Constitution. Id. Instead, Snyder relies on out-of-state cases, national “consensus,” and the historical practice in Indiana. Id. Regardless of the merits of Snyder’s reasoning, the opinion at least has the virtue of clarifying that current inmates will not be able to vote. The plurality opinion here leaves that highly important question unanswered.
Finally, whatever its flaws, Snyder does establish a somewhat clear rule of law. Current prisoners cannot vote, whereas released prisoners can vote unless their crime was akin to “treason, perjury, malicious prosecution, and election fraud.” Id. at 782, 785. My colleagues’ opinion, by going only partway on Snyder, does not pass that clarity threshold and instead fosters uncertainty.
I would grant that the plurality has done a good job of saying what the legal standard for disqualification isn’t. It is not conviction of a felony, conviction of a misdemeanor, or conviction of a crime with the potential for incarceration in a penitentiary. However, other than the indeterminate language I’ve quoted above, the plurality offers no further guidance as to what the standard is. As I have already argued, this standard is essentially no standard at all and will lead to more voting and ballot cases as we sort out the implications of today’s ruling.
Having voiced my criticisms of the plurality, let me now explain how I would decide this case. As I discuss below, I think there are ample grounds for holding that our constitution, in its current form, disqualifies felons and only felons from voting and holding public office.
Our constitution gives the right to vote to all citizens, Iowa Const, art. II, § 1, subject to the following exception: “[A] person convicted of any infamous crime shall not be entitled to the privilege of an elector.” Id. art. II, § 5. Although article II, section 5 was amended and reenacted by the general assembly and the people of Iowa a few years ago, the prohibition on voting by persons convicted of infamous crimes dates back to our original constitutional history. Thus, our 1857 constitution contained this language, which it borrowed essentially verbatim from the 1846 constitution. Compare Iowa Const, art. II, § 5 (1857), with Iowa Const, art. II, § 5 (1846).
I agree with the plurality on two points it makes about the text of article II, section 5. First, “infamous” is rather vague language. It does not cry out with specificity. Second, our framers’ use of the word “infamous” and especially the phrase “infamous crime” suggest that our interpretive focus should be on the category of crime, not the type of punishment.
However, I think some additional lessons can be extracted from our early constitutional history. I have already mentioned the 1839 territorial legislation that more or less equates “infamous crime” for purposes of denying voting privileges with felony. See The Statute Laws of the Territory of Iowa, Code of Criminal Jurisprudence, Tenth Div., § 109, at 182; see also Homan v. Branstad, 812 N.W.2d 623, 629 (Iowa 2012) (indicating that in construing a provision of the Iowa Constitution, “our mission ‘ “is to ascertain the intent of the framers” ’ ” (quoting Rants v. Vilsack, 684 N.W.2d 193, 199 (Iowa 2004))). Hence, I *861 remain unpersuaded that “infamous crime” as used in article II, section 5 could not mean the same thing as felony, at least if the legislature made that choice. The plurality reaches its conclusion based exclusively on the following syllogism:
(1) Article II, section 2 of the Iowa Constitution provides that electors “shall, in all cases except treason, felony, or breach of the peace, be privileged from arrest on the days of election” and article III, section 11 provides that senators and representative “in all cases, except treason, felony, or breach of the peace, shall be privileged from arrest during the session of the General Assembly.”
(2) Because the word “felony” is used in these other provisions of our constitution, and “infamous crime” is used in article II, section 5, infamous crime cannot mean the same thing as felony.
This strikes me as a relatively weak argument. The obvious point it ignores is that the language in article II, section 2 and article III, section 11 is a direct borrowing from Article I, Section 6 of the United States Constitution.[7] Given the specific source of these two provisions, I do not think we can use them as a lexicon for interpreting the rest of the Iowa Constitution. And by the way, does this mean that treason is not a felony?
As noted by my colleagues, there has been considerable water under the bridge since 1857. In 1916, we declared that any crime punishable by imprisonment in the penitentiary was an infamous crime for purposes of article II, section 5. See Blodgett v. Clarke, 177 Iowa 575, 578, 159 N.W. 243, 244 (1916) (per curiam). We reiterated that interpretation in 1957. See State ex rel. Dean v. Haubrich, 248 Iowa 978, 980, 83 N.W.2d 451, 452 (1957). However, when those cases were decided, “felony” and “crime punishable by imprisonment in the penitentiary” were synonymous. See Iowa Code §§ 5093-5094 (1897); id. §§ 687.2, .4 (1954). There was no such thing as an aggravated misdemeanor punishable by imprisonment in the penitentiary. Thus, like the Panel and the district court, I do not regard those precedents as controlling on whether a nonfelony that was potentially punishable by imprisonment in the penitentiary would disqualify a person from voting. Those cases do effectively hold that felons cannot vote or hold elective office under the Iowa Constitution. And for that proposition, I think they remain good law.
Furthermore, in 1994, the legislature enacted the current law that specifically defines “infamous crime” for voting and elective office purposes to mean a felony. See 1994 Iowa Acts ch. 1180, § 1 (codified at Iowa Code § 39.3(8) (1995)). This takes on particular significance, in my view, because our general assembly, in 2006 and 2007, and the voters of our state, in 2008, repealed the existing article II, section 5 and approved a new version. See 2006 Iowa Acts ch. 1188, § 1; 2007 Iowa Acts ch. 223, § 1.
The previous version of article II, section 5, dating back to 1857, read, “No idiot, or insane person, or person convicted of any infamous crime, shall be entitled to the privilege of an elector.” Iowa Const, art. II, § 5 (1857). The new version reads, “A person adjudged mentally incompetent to vote or a person convicted of any infamous *862 crime shall not be entitled to the privilege of an elector.” Iowa Const, art. II, § 5 (amended 2008).
It is clear that the legislature’s specific purpose in 2006 and 2007 was to remove offensive and outdated language from article II, section 5. However, the legislature knew it was keeping in place the prohibition on voting by those convicted of infamous crimes and knew that its own laws at that time defined infamous crime as a felony. See Iowa Code § 39.8(8) (2007). It would be absurd to suggest the legislature intended to approve a constitutional amendment that struck down its own law — Iowa Code section 39.3(8). Therefore, when the legislature twice voted to repeal and replace the existing article II, section 5 with a new version, I believe it ratified its own existing interpretation of that provision under which infamous crime meant a felony.
We have long adhered to this principle as it applies to statutory amendments. “When the legislature amends some parts of a statute following a recent interpretation, but leaves others intact, this ‘may indicate approval of interpretations pertaining to the unchanged and unaffected parts of the law.’ ” State v. Sanford, 814 N.W.2d 611, 619 (Iowa 2012) (quoting 2B Norman J. Singer & J.D. Shambie Singer, Statutes and Statutory Construction § 49:10, at 144 (7th ed.2008)); see also Jenney v. Iowa Dist. Ct., 456 N.W.2d 921, 923 (Iowa 1990); State ex rel. Iowa Dep’t of Health v. Van Wyk, 320 N.W.2d 599, 604 (Iowa 1982). Logic dictates that this rule should apply equally to constitutional amendments.
A decision of the Kansas Supreme Court illustrates this principle. See In re Cent. Ill. Pub. Servs. Co., 276 Kan. 612, 78 P.3d 419 (2003). In that case, several companies that distributed and sold natural gas, but not in Kansas, argued they were entitled
to a constitutional tax exemption for their inventory of gas stored in Kansas. Id. at 422. However, under a 1992 amendment to the relevant section of the Kansas Constitution, merchants’ inventory for public utilities was denied an exemption. Id. at 424. Yet, Kansas law as of 1992 limited the statutory definition of “public utility” to companies that were engaged in transporting or distributing natural gas to, from, or within the state of Kansas, or that were engaged in storing natural gas in an underground formation in Kansas. Id. at 424-25. In concluding that this narrow statutory definition should apply, the court indicated among other things that the constitutional amendment should be construed consistently with “the statutes in existence at the time the ... amendment was proposed and adopted.” Id. at 426. Here too, where article II, section 5 was repealed and reenacted in 2006-2008, I believe the term “infamous crime” should be construed consistent with the statute in existence at that time, Iowa Code § 39.3(8). See also Cal. Motor Express v. State Bd. of Equalization, 133 Cal.App.2d 237, 283 P.2d 1063, 1065 (1955) (finding that reenactment of a constitutional provision “which has a meaning well established by administrative construction is persuasive that the intent was to continue the same construction previously recognized and applied”); Wakem v. Inhabitants of Town of Van Buren, 137 Me. 127, 15 A.2d 873, 875-76 (1940) (“It is a general rule that a reenactment, in substantially the same language, of a constitutional provision which had been previously construed and explained by the court, carries with it the same meaning previously attributed by the court to the earlier provision, in the absence of anything to indicate that a different meaning was intended.”); Bodie v. Pollock, 110 Neb. 844, 195 N.W. 457, 458 (1923) (“It is well settled in many, if not most, of the jurisdictions of the country *863 that, where a construction of constitutional provisions has been adopted and a constitutional convention thereafter re-enacts such provisions, it re-enacts not only the language of the provisions but the construction which has attached to the same.”).
It was also no secret that Iowa law forbid voting by convicted felons when the proposed amendment went before the public at the 2008 general election. For example, a contemporary editorial in Iowa’s largest newspaper said the following about the proposed revision of article II, section 5,
It is worth thinking about whether an amendment belongs in the Constitution at all denying the vote to anyone based on diminished mental capacity, which is a relative thing. Also, in this section, the right to vote is denied to convicted felons, even those who have served their sentences, which is wrong. But those are questions for another day. For now, the language of the Iowa Constitution should be devoid of language that is seen as belittling.
See Editorial, Change Harsh Wording in State Constitution, Des Moines Register, October 31, 2008, at A14.
Personally, I agree with this editorial. I believe that convicted felons who have served their sentence and paid their debt to society ought to be able to vote, without requiring dispensation from the governor. By permanently disenfranchising convicted felons, Iowa puts itself in a small minority of three states. But my personal views do not carry weight when it comes to interpreting the Iowa Constitution.
Because the Iowa Constitution forbids convicted felons but not convicted misde-meanants from voting, I concur in the result in this case.
WATERMAN, J., joins this special concurrence.

. The plurality sows additional confusion by citing Dunn v. Blumstein, 405 U.S. 330, 342, 92 S.Ct. 995, 1003, 31 L.Ed.2d 274, 284 (1972), and suggesting that a "compelling governmental interest” must support any disenfranchisement of a voter convicted of a crime. The plurality ignores the fact that two years after Dunn, the United States Supreme Court rejected the view that felon disenfranchisement must be supported by a compelling state interest, noting that the Fourteenth Amendment expressly contemplates the disenfranchisement of voters convicted of a crime. See Richardson v. Ramirez, 418 U.S. 24, 54-55, 94 S.Ct. 2655, 2670-71, 41 L.Ed.2d 551, 570-71 (1974); see also Madison v. State, 161 Wash.2d 85, 163 P.3d 757, 767-68 (2007) (reviewing the caselaw that holds the right to vote is not fundamental for convicted felons).

. Murder is not in the list, but at that time murder was punishable by death, which made voting rights a moot point. See The Statute Laws of the Territory of Iowa, Code of Criminal Jurisprudence, First Div., § 2, at 150.

. Article I, Section 6 of the United States Constitution states,
The Senators and Representatives ... shall in all Cases, except Treason, Felony and Breach of the Peace, be privileged from Arrest during their Attendance at the Session of their respective Houses, and in going to and returning from the same....
U.S. Const, art. I, § 6.